IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| The Cincinnati Enquirer, | : | Case No. 1:20-cv-758 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | Order Granting in Part and Denying in Part Motions for Summary Judgment |
| U.S. Department of Justice, *et al.*, | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 19) and Plaintiff's Cross-Motion for Summary Judgment (Doc. 22). The parties have filed Memoranda in Opposition and Reply briefs. (Docs. 21, 23, 24, and 25.) In this suit, Plaintiff The Cincinnati Enquirer seeks disclosure of public records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Defendants the United States Department of Justice ("DOJ") and the United States Drug Enforcement Agency ("DEA") argue FOIA does not require the disclosure of any records in this case. For the reasons that follow, the Court concludes that Defendants have not complied with FOIA to the extent that they categorically declined to search for and produce certain documents. The Court will **GRANT IN PART AND DENY IN PART** summary judgment to the Enquirer and to Defendants.

I.  **BACKGROUND**

A.  **Factual History**

Defendants have stipulated to the truth of the facts alleged in the Complaint for purposes of summary judgment. (Doc. 1; Doc. 18 at PageID 76.)

1

1. **Investigation of Ryan Jacobs**

The DEA, in cooperation with state and local law enforcement officials, in mid-2015 opened a drug trafficking investigation in Northern Kentucky centering on Ryan Jacobs. Jacobs was in an intimate relationship with Client 1, a Kentucky resident. Client 1 and her husband, Client 2, frequently purchased illegal narcotics from Jacobs. Client 1 and Client 2 were friends with a Commonwealth's Attorney for a judicial circuit located in Kentucky ("the Commonwealth Attorney").

On September 28, 2015, Jacobs was arrested on numerous state drug trafficking charges.[1] The Commonwealth Attorney engaged in multiple text message conversations with Client 1 about Jacobs's arrest over the next week.

On October 2, 2015, a DEA agent received an email from an Assistant Commonwealth Attorney regarding the arrest of Jacobs which stated:

> This arrest has certainly spooked some people throughout Northern Kentucky. [The Commonwealth Attorney] especially has had people contacting him about it to the point that he and [I] are very interested to see [Ryan Jacobs'] cellphone records. I know there was a wire so [I]'m sure there are records of his texts but [I] wasn't sure if we could get a copy or not. We would be willing to come there and view them if that is necessary.

(Doc. 1 at PageID 4.)

The Assistant Commonwealth Attorney had additional contact with the DEA agent on October 5, 2015. They discussed that Jacobs gave the DEA "a lot of information in reference to the case" during an interview, but that Jacobs did not "want the facts to get out in a preliminary hearing." (*Id.* at PageID 5.) They also discussed that the DEA agent might "find some of [Jacobs's] women" if he attended a preliminary hearing set for October 6, 2015. (*Id.*) The

---

[1] Jacobs subsequently pleaded guilty to conspiring to distribute over 50 grams of methamphetamine and money laundering.

Assistant Commonwealth Attorney stated that he "didn't know [Client 1] was one of his women." (*Id.*) The DEA agent then asked how he knew about Client 1. The Assistant Commonwealth Attorney stated that he received the information from listening to Jacobs's jail calls. The Assistant Commonwealth Attorney asked the DEA agent if the Commonwealth Attorney's name had been mentioned.

October 6, 2015, a DEA agent contacted Client 2 for an interview. Client 2 had a conversation with the Commonwealth Attorney twenty minutes after talking with the DEA agent. After talking with the Commonwealth Attorney, Client 2 hired a local criminal defense attorney ("Client 2 Attorney"). The Commonwealth Attorney had multiple communications with Client 1, Client 2, and Client 2 Attorney.

On October 7, 2015, Client 2 communicated with the Commonwealth Attorney before and after he was interviewed by DEA agents. That same day, DEA agents interviewed Client 1, with her attorney ("Client 1 Attorney") present. During the interview, Client 1 admitted to contacting the Commonwealth Attorney to ask him to help Jacobs. The Commonwealth Attorney told Client 1 that "[t]here's nothing I can do for him even if I wanted to." Client 1 also provided the DEA with pictures of her text messages with the Commonwealth Attorney. She told DEA agents that the Commonwealth Attorney had chopped up cocaine for her and Client 2.

Also on October 7, 2015, the Commonwealth Attorney contacted and had a thirty-seven minute call with a local police chief (the "Police Chief"). The Commonwealth Attorney contacted the Police Chief after already communicating with Client 2 Attorney. The Commonwealth Attorney then exchanged several text messages with a local criminal defense attorney ("LCDC"), after communicating with the Police Chief and Client 2 Attorney.

On October 9, 2015, Client 2 contacted the Commonwealth Attorney. The Commonwealth Attorney then communicated with LCDC and Client 2 Attorney. Later that day, the Commonwealth Attorney met with two Assistant U.S. Attorneys ("AUSAs") and two DEA agents regarding the Commonwealth Attorney's involvement in the Jacobs investigation. The Commonwealth Attorney admitted that he received information from Client 2 Attorney and Client 1 Attorney regarding the DEA interviews of Client 2 and Client 1. The AUSAs and DEA agents directed the Commonwealth Attorney to cease all further contact with Client 2 while the Jacobs investigation was ongoing. The Commonwealth Attorney contacted LCDC immediately after his meeting with AUSAs and DEA agents. LCDC then called Client 2. Client 2 had regular communications with LCDC over the next two months.

On October 15, 2015, Jacobs implicated the Commonwealth Attorney during his third interview with DEA agents at the detention center. Jacobs stated that he witnessed the Commonwealth Attorney leaving Client 2's office as Jacobs was arriving to make a cocaine delivery to Client 2 and that Client 2 requested cocaine for his friend who just left.

Client 1 also implicated the Commonwealth Attorney during her second interview with the DEA on October 27, 2015. She stated that she had witnessed the Commonwealth Attorney using ecstasy. She also stated that the Commonwealth Attorney had a key to Client 2's office and that Jacobs delivered cocaine to Client 2's office.

The Commonwealth Attorney participated at a court bond hearing for Jacobs on October 28, 2015. He refused to join the DEA's and Jacobs's request for reduced bond so that Jacobs could be released and cooperate in ongoing drug trafficking investigations. Then, on October 29, 2015, the DEA had a second interview with Client 2 and Client 2 Attorney. Client 2 Attorney stated that the Commonwealth Attorney told her about Client 1's affair.

On October 30, 2015, the Commonwealth Attorney met with the Police Chief. The Police Chief reported to an AUSA that the Commonwealth Attorney had been told that Jacobs had implicated him in the illegal narcotics investigation.

On February 25, 2016, two Covington, Kentucky police detectives met with the Assistant Commonwealth Attorney to discuss releasing Jacobs from jail to work as an FBI informant. The Assistant Commonwealth Attorney stated that the Commonwealth Attorney would not agree to release inmates to work as confidential informants for the FBI, but he would agree to release Jacobs to work as a confidential information on the state level.

On April 27, 2016, the Commonwealth Attorney stated that he would not agree to issue a search warrant in a joint police-FBI crystal methamphetamine investigation if the DEA agent involved in the Jacobs investigation also participated in that investigation.

**2. Operation Speakeasy**

In 2016, the DEA opened "Operation Speakeasy" to investigate the Commonwealth Attorney for obstruction of justice in the Jacobs investigation and other federal agency investigations. DEA and law enforcement officials determined that enough evidence had been obtained to charge the Commonwealth Attorney with obstruction of justice. DEA and law enforcement officials presented the evidence obtained in Operation Speakeasy to the United States Attorney's office. Kerry Harvey, the United States Attorney for the Eastern District of Kentucky in 2016, refused to bring charges against the Commonwealth Attorney.

**B. FOIA Requests**

The Enquirer submitted FOIA requests to the DEA in Washington D.C. by letter dated December 20, 2019. It requested documents created between January 1, 2015 and June 1, 2016 on the following topics:

> • All investigative reports related to the arrest and subsequent investigation of Ryan Jacobs, including witness statements, interview transcripts, investigation notes, evidence reports, and any other materials compiled by the investigating agencies. This should include all documents DEA Agent Stacie Modesitt collected from local, state and federal law enforcement as part of the investigation into Ryan Jacobs.
>
> • Documents from or related to anything classified or organized under "operation speakeasy," which surrounded drug purchase activity in Kenton County, Kentucky. Include any documents that were part of that classification and documents that reference "operation speakeasy."
>
> • Documents related to and which documented the monitored phone calls by the DEA when agents made 11 controlled purchases from Ryan Jacobs.
>
> • Documentation related to the DEA's Oct. 15, 2015 interview with Ryan Jacobs at the Kenton County Detention Center in Covington, Kentucky. Include audio and/or video recordings and transcripts of the interview.

(Doc. 1-1 at PageID 17.)

The DOJ responded in a letter dated January 31, 2020. (Doc. 1-2.) It refused to conduct a search for the records requested on Ryan Jacobs because "disclosure of law enforcement records concerning an individual could reasonably be expected to constitute an unwarranted invasion of personal privacy. *See* 5 U.S.C. § 552(b)(7)(C)." (*Id.* at PageID 18.) It called such records "categorically exempt from disclosure." *Id.* As to the Operation Speakeasy request, the DOJ stated that it searched the DEA's Investigative Reporting and Filing System, but it was "unable to locate any records responsive to your request." (*Id.*)

The Enquirer then appealed the denial of request for records concerning Jacobs. (Doc. 1-3 at PageID 21.) It stated that there "was an overriding public interest that the investigative records should be released because of Ryan Jacobs' widespread illegal drug distribution practices in Northern Kentucky." (*Id.*) The DOJ denied the appeal. (Doc. 1-4.) It again concluded that Exemption 7(C) to FOIA disclosure applied and that the DEA "was not required to conduct a search for the requested records." (*Id.* at PageID 23.)

6

C.     **Federal Lawsuit**

Following the denial of its FOIA request and appeal, the Enquirer initiated this suit on September 22, 2020. The Enquirer alleges one count for violation of FOIA. (Doc. 1 at PageID 15.) It seeks an order compelling Defendants to complete the records search, produce all non-exempt records, produce a *Vaughn* index of responsive records withheld under an exemption, and pay an award of attorney fees and costs. (*Id.* at 15–16.) Defendants filed an Answer denying they violated FOIA, and then the parties agreed to proceed to summary judgment based on stipulated facts in the Complaint in lieu of pursuing discovery. (Docs. 16, 18.) The cross-Motions for Summary Judgment are fully briefed and ripe for adjudication.

## II.    LEGAL STANDARDS

A.     **Summary Judgment**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties here agree to the relevant facts, but they dispute the legal issue of whether Defendants have complied with FOIA. District courts have subject matter jurisdiction pursuant to FOIA "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).[2] "Most FOIA cases are decided on

---

[2] The subsection provides in full:

> On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a

7

summary judgment, since the primary question is a legal one: whether the withheld documents are covered by one of the statutory exemptions." *Am. C.L. Union of Michigan v. F.B.I.*, 734 F.3d 460, 465 (6th Cir. 2013).

**B.     Freedom of Information Act**

   **1.     Overview and Exemption 7(C)**

FOIA "implements a general philosophy of full agency disclosure of government records," unless the disclosure falls within one of nine enumerated exemptions. *Detroit Free Press Inc. v. U.S. Dep't of Just.*, 829 F.3d 478, 480 (6th Cir. 2016) (internal quotation and citation omitted). The exemptions are "narrowly construed." *ACLU of Mich. v. F.B.I.*, 734 F.3d 460, 465 (6th Cir. 2013) (citation omitted). FOIA requires government agencies to produce "reasonably segregable portions" of responsive documents that are not subject to one of the exemptions:

> Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

5 U.S.C. § 552(b). Finally, when reviewing a FOIA request denial, the district court "may examine the contents of such agency records in camera to determine whether such records or any

---

court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

5 U.S.C. § 552(a)(4)(B).

part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B).

FOIA Exemption 7(C) exempts from production "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an *unwarranted* invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (emphasis added). "In the case of Exemption 7(C), the statute requires us to protect, in the proper degree, the personal privacy of citizens against the uncontrolled release of information compiled through the power of the State." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004). "[W]hether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny." *U.S. Dep't of Just. v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 772 (1989) (internal quotation omitted).

The public's interest in disclosure at its core is to contribute "to public understanding of the operations or activities of the government." *Detroit Free Press*, 829 F.3d at 485 (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994)). Disclosure can be appropriate if the information "sheds light on an agency's performance of its statutory duties." *Reporters Comm.*, 489 U.S. at 773 (citation omitted). On the other extreme, disclosure is not appropriate when one private citizen seeks information about another private citizen and not about the conduct of the agency that has possession of the requested records. *Id.* at 773 (citation omitted).

The Supreme Court explained how privacy interests can be overcome when Exemption 7(C) is at issue:

9

> [Exemption 7(C)] requires the person requesting the information to establish a sufficient reason for the disclosure. First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake. Second, the citizen must show the information is likely to advance that interest. Otherwise, the invasion of privacy is unwarranted.

*Favish*, 541 U.S. at 172. For Exemption 7(C), therefore, the person making the disclosure request must identify the reason for requesting the information so that the Court can balance the personal privacy interests of citizens against the disclosure interests. *Id.*[3] The Supreme Court went on to hold that "where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, . . . the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Id.* at 174. "[M]ore than bare allegations of federal malfeasance are required before the public interest becomes significant enough to overcome the privacy concerns embodied in Exemption 7(C)." *Rimmer v. Holder*, 700 F.3d 246, 258 (6th Cir. 2012).

### 2.  *Vaughn* Index versus Categorical Denials

In most cases, "to facilitate review and the adversarial process, the government must support its position [to withhold disclosure] with detailed affidavits and a descriptive index with 'a relatively detailed analysis' of 'manageable segments' of the documents." *ACLU of Mich.*, 734 F.3d at 465 (quoting and following *Vaughn v. Rosen,* 484 F.2d 820, 826 (D.C. Cir. 1973).) The use of *Vaughn* indexes is "routine." *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 544 (6th Cir. 2001); *see also Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just. ("CREW")*, 978 F. Supp. 2d 1, 7 (D.D.C. 2013) (calling the production of a *Vaughn* index the "ordinary" and

---

[3]  This is different than the standard for FOIA requests generally. Ordinarily, "whether an invasion of privacy is warranted cannot turn on the purposes for which the request for information is made" nor does "the identity of the requesting party" have a "bearing on the merits of his or her FOIA request." *Reporters Comm.*, 489 U.S. at 771.

"usual" practice). The assertions of the government agency in a *Vaughn* index or affidavit are entitled to a presumption of good faith. *ACLU of Mich.*, 734 F.3d at 465. The index must contain "sufficient detail to allow a court to make an independent assessment of the claims for exemptions from disclosure." *Rugerio*, 257 F.3d at 544. A district court can request to review the documents *in camera* if the *Vaughn* index is insufficient. *ACLU of Mich.*, 734 F.3d at 465 (citing 5 U.S.C. § 552(a)(4)(B)).

In lieu of providing a *Vaughn* index or affidavit to explain a decision to withhold disclosure of specific documents, government agencies can issue categorical denials of disclosure in limited circumstances. "[C]ategorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." *Reporters Comm.*, 489 U.S. at 776. Although the Supreme Court recognized in *Reporters Committee* that the language of Exemption 7(C) seemed "to contemplate a case-by-case showing[,]" it held that a "categorical balance" could be undertaken "for an appropriate class of law enforcement records or information." 489 U.S. at 776–777. "[W]e hold as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no 'official information' about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is 'unwarranted.'" *Id.* at 780 (denying request for third-party FBI rap sheets).

### III. ANALYSIS

Turning to the FOIA request here, the Enquirer first requested two general categories of information: (1) documents related to Operation Speakeasy and (2) documents relating to the

11

DEA investigation of Ryan Jacobs. The Court will address each category in turn.

### A. Operation Speakeasy

The DEA conducted a search for responsive records as to Operation Speakeasy, but it did not turn up responsive records. Angela D. Hertel, the United Chief of the Legal and External Affairs Units of the Freedom of Information and Privacy Act Section within the DEA, confirmed these facts and provided details concerning the electronic search conducted in a sworn Declaration. (Doc. 19-1 at PageID 104–106.) This representation is entitled to a presumption of good faith, *see ACLU of Mich.*, 734 F.3d at 465, and the Enquirer has not offered any basis to challenge it. The Court will grant summary judgment to Defendants and deny it to the Enquirer insofar as the Enquirer was seeking records related to Operation Speakeasy.

### B. Ryan Jacobs Investigation

The DEA did not conduct a search for records concerning the Jacobs investigation, but it instead issued a categorical denial based on FOIA Exemption 7(C). There is no dispute that FOIA Exemption 7(C) is relevant. The Enquirer is seeking DEA records "compiled for law enforcement purposes" that might "constitute an . . . invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The main issue is whether the invasion of personal privacy caused by a disclosure is "reasonably expected to [be] unwarranted," either categorically or on a document-by-document basis. *Id.* (exempting disclosure of documents compiled for law enforcement purposes if the disclosure would constitute an unwarranted invasion of personal privacy). The parties dispute the strength of the privacy interests asserted and the purported public interest in disclosure. As to the latter dispute, the Court must examine whether the Enquirer has offered a substantial public interest and that the disclosure is likely to further that interest. *See Favish*, 541 U.S. at 172.

Defendants assert that a categorical denial of disclosure was appropriate under *Reporters Committee*. The Enquirer, conversely, asserts that Defendants should conduct a search and provide a *Vaughn* index explaining why particular document(s) are being withheld from disclosure under Exemption 7(C) as was required in *CREW*, another case seeking disclosure of records about the criminal investigation of a public official.

1. **Privacy Interests**

The names and other identifying information about persons subject to a criminal investigation are protected privacy interests because disclosure can lead to "embarrassment, harassment, and even physical danger." *Rimmer*, 700 F.3d at 257 (citing *Kiraly v. FBI*, 728 F.2d 273, 277 (6th Cir. 1984)). "[I]nformation in an investigatory file tending to indicate that a named individual has been investigated for suspected criminal activity is, at least as a threshold matter, an appropriate subject for exemption under 7(C)." *Fund for Const. Gov't v. Nat'l Archives & Recs. Serv.*, 656 F.2d 856, 863 (D.C. Cir. 1981). "This privacy interest exists not only for those who are suspects in an investigation, but also for third parties mentioned in the documents, such as witnesses, informants, and investigators." *Rimmer*, 700 F.3d at 257. The privacy interests of cooperating witnesses should be protected "to insure that such persons remain willing to provide such information in the future." *Kiraly*, 728 F.2d at 278 (citation omitted).

The Enquirer first argues that Jacobs has no privacy interest because he already has been arrested, tried, convicted, and incarcerated. This argument is legally incorrect. The Enquirer cites *Hollis v. U.S. Dep't of Army*, 856 F.2d 1541, 1545 (D.C. Cir. 1988), for the broad proposition that privacy interests are not implicated when a public "release consists of information to which the general public already has access." However, *Hollis* is not a FOIA case

and does not speak to the specific issue of the rights of a convicted person to privacy in his criminal investigative files. Convicted persons do maintain privacy interests. The Supreme Court held in *Reporters Committee* that individuals have privacy interests in their rap sheet information. 489 U.S. at 780. Lower courts have recognized these privacy interests as well. *See ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 7 (D.C. Cir. 2011) (recognizing that convicted persons have a privacy interest in the facts of their conviction, but that the interest is "weaker" than the interest of those who have been investigated or charged, but not convicted); *O'Kane v. U.S. Customs Serv.*, 169 F.3d 1308, 1310 (11th Cir. 1999) ("[I]ndividuals have a substantial privacy interest in their criminal histories.").

On the other hand, the Enquirer acknowledges the privacy interests of the Commonwealth Attorney and other individuals mentioned in the Jacobs investigative files. It suggests that the identifying information of the Commonwealth Attorney and other individuals can be redacted to protect those privacy interests. *See CREW*, 978 F. Supp. 2d at 11 (stating that the privacy interest of third parties can be "adequately protected by redaction").

### 2. Public Interest and Balancing

The Court must balance the privacy interests above against the public policy interests advanced by the Enquirer in favor of disclosure. *See Favish*, 541 U.S. at 172. The public interest must be significant, and the material sought must be likely to advance that interest. *Id.* The Enquirer asserts a public interest in the United States Attorney's performance of statutory duties, specifically the decision not to prosecute the Commonwealth Attorney despite the DEA's recommendation to prosecute. Of note, the Enquirer is not arguing that there is a public interest related to the investigation or prosecution of Ryan Jacobs himself. The Enquirer, accordingly, appears to implicitly concede that there is no public interest in the Jacobs investigative records

14

except to the extent that individual documents and files shed light on the United States Attorney's decision not to prosecute the Commonwealth Attorney for obstruction of justice.

It bears emphasizing that the alleged wrongdoing by the Commonwealth Attorney is not itself a significant public interest for FOIA purposes. "FOIA is concerned only with shedding light on misconduct of the *federal* government, not *state* governments." *Rimmer*, 700 F.3d at 258 (emphasis added). Exposing possible criminal behavior by a public official such as the Commonwealth Attorney is not sufficient public interest unless it also reveals something about a federal agency's conduct, here the decision of the United States Attorney not to prosecute the Commonwealth Attorney. *See CREW*, 978 F. Supp. 2d at 11–12.

The Enquirer likens this case to *CREW* where the district court required the DOJ to submit a *Vaughn* index of records involving the DOJ investigation of former Senator John Ensign. *Id.* at 4. Like in this case, CREW requested the investigative records on the basis that there was a public interest in the DOJ's decision to close the investigation without bringing criminal charges against former Senator Ensign. *Id.* at 12. The district court remarked that the records "could well be suffused, from top to bottom, with information about DOJ's performance of its duties." *Id.* at 12 (citation omitted).

However, the district court cautioned that the public does not always have a substantial public interest in a prosecution decision. A decision not to prosecute an individual, standing alone, is ordinarily not particularly illuminating about an agency's decisionmaking processes because it is only a "single data point." *CREW*, 978 F. Supp. 2d at 13; *see also Fund for Const. Gov't*, 656 F.2d at 863 (stating that prosecutorial decisions are "rarely" subject to public scrutiny). Compilations of charging decisions are more informative. *CREW*, 978 F. Supp. 2d at 13. But the decision whether to prosecute can be a substantial public interest where there is

widespread media attention, an ongoing public policy discussion, and the individual has a high public profile. *Id.* In the *CREW* case, the FOIA request involved former Senator John Ensign who had admitted to an affair with a former staffer, was the subject of a criminal investigation which he publicly discussed, was the subject of a Select Senate Committee on Ethics investigation and referral to the DOJ, and had resigned his Senate seat. *Id.* at 4, 8–9.

Defendants correctly point out that the facts underlying this FOIA request are distinguishable from the specific facts of *CREW*. The Commonwealth Attorney has stronger privacy interests than did former Senator Ensign. There is no suggestion that the Commonwealth Attorney has admitted to any wrongdoing or resigned his position. There is no suggestion that there has been widespread media attention or public policy discussion related to the allegations against the Commonwealth Attorney.

On the other hand, Defendants have stipulated for purposes of the pending Motions the truth of the facts alleged in the Complaint. Defendants have stipulated, therefore, that the DEA investigated the Commonwealth Attorney for obstruction of justice and determined there was sufficient evidence to charge him. This suffices as the "substantial credible evidence" of wrongdoing by the Commonwealth Attorney, *see CREW*, 978 F. Supp. 2d at 12, and it provides a basis for a reasonable person to suspect that the United States Attorney acted with impropriety in making the decision not to prosecute the Commonwealth Attorney, *see Favish*, 541 U.S. at 174. Also, the public has a greater interest in the United States Attorney's decision not to prosecute a public official, particularly a public figure charged with enforcing the law, than in a single decision not to prosecute an ordinary private citizen. The *CREW* court suggested that a court should focus on the "rank of the public official involved and seriousness of the misconduct alleged" to determine the strength of the public interest in an investigation and prosecutorial

decision. 978 F. Supp. 2d at 13 (citation omitted). The public official here is the highest elected law enforcement official in a Kentucky county and the alleged crime involved undermines the integrity of the justice system itself.

Moreover, the production of a *Vaughn* index in response to a FOIA request is the routine and usual practice. *See Rugiero*, 257 F.3d at 544; *CREW*, 978 F. Supp. 2d at 7. In *Fund for Constitutional Government*, a case cited by Defendants, the federal agency filed *Vaughn* indices before the court determined that disclosure was not required. 656 F.2d at 860. When the Supreme Court allowed the categorical denial of rap sheet information in *Reporters Committee*, it was because the request did not seek "official information" about a government agency. 489 U.S. at 780. Conversely, the Enquirer here is seeking information about an investigation that may shed light on a specific United States Attorney's prosecutorial decision concerning a public figure and law enforcement official who allegedly obstructed justice. The Court concludes that the disclosure of a *Vaughn* index is appropriate here.

Defendants shall submit the documents responsive to the FOIA requests about the Ryan Jacobs investigation and a proposed *Vaughn* index to the Court for an *in camera* review. Defendants must include in the *Vaughn* index the bases for withholding the responsive documents, such as the privacy interests involved or whether the responsive documents do not support the proffered public interest in the United States Attorney's prosecutorial decision. Defendants must redact the names of individuals and substitute pseudonyms such as Client 1, Client 2, and Commonwealth Attorney to protect privacy interests as was done in the Complaint.

IV. **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 19) is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's Cross-Motion for Summary

17

Judgment (Doc. 22) is **GRANTED IN PART AND DENIED IN PART**. Defendants are not required to respond further to the extent the Enquirer requested documents concerning Operation Speakeasy. Insofar as the Enquirer requested documents concerning Ryan Jacobs, Defendants are ordered to produce the responsive documents and a proposed *Vaughn* index to the Court for an *in camera* review within 60 days of the date of this Order.

    **IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge