| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | SOUTHERN DISTRICT OF OHIO |
| 3 | WESTERN DIVISION |
| 4 | - - - |

```
 5   THE CINCINNATI ENQUIRER,        : CASE NO. 1:20-cv-00758
     a division of Gannett GP Media, :
 6   Inc.,                           : PRETRIAL ORAL ARGUMENTS
                                     :
 7                 Plaintiff,        :
            vs.                      : 27th of April, 2021
 8                                   : 11:03 a.m.
     DEPARTMENT OF JUSTICE; DRUG     :
 9   ENFORCEMENT ADMINISTRATION,     :
                                     :
10                 Defendants.       :
```

```
11                        - - -
                 TRANSCRIPT OF PROCEEDINGS
12        BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE
                          - - -
13
     APPEARANCES:
14
     For the Plaintiff:
15
                        John Charles Greiner, Esq.
16                      Graydon Head and Ritchey, LLP
                        312 Walnut Street, Suite 1800
17                      Cincinnati, Ohio 45202
                        and
18                      Frank Matthew Schultz, Esq.
                        Graydon Head and Ritchey, LLP
19                      2400 Chamber Center Drive, Suite 300
                        Fort Mitchell, Kentucky 41017
20
     For the Defendants:
21
                        William Bryan King, II, Esq.
22                      US Attorneys Office
                        Atrium Two
23                      221 East Fourth Street, Suite 400
                        Cincinnati, Ohio 45202
24
     Law Clerk:         Margaret Fechtel, Esq.
25
     Courtroom Deputy:  William Miller
```

```
 1      Court Reporter:      Lisa Conley Yungblut, RDR, RMR, CRR, CRC
                             United States District Court
 2                           100 East Fifth Street
                             Cincinnati, Ohio 45202
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>PROCEEDINGS</u>

1

2      (Proceedings held in open court at 11:03 a.m.)

3            THE DEPUTY:  All rise.  The Honorable Susan J.

4      Dlott, Judge of The United States District Court for the

5      Southern District of Ohio.  Hear ye, hear ye, hear ye:  This

6      United States District Court for the Southern District of

7      Ohio is now in session.  All persons having business before

8      this Honorable Court shall draw near, give their attention,

9      and they shall be heard.  God save the United States and

10     this Honorable Court.  You may be seated.

11        Case No. 1:20-CV-758, *The Cincinnati Enquirer versus*

12     *Department of Justice*.

13            THE COURT:  Good morning to everyone.  Let me ask

14     counsel to please enter their appearances for the record.

15            MR. KING:  Bill King on behalf of the United States

16     and Department of Drug Enforcement Administration.

17            THE COURT:  Thank you, Mr. King.

18        Mr. Greiner.

19            MR. GREINER:  Jack Greiner and Frank Schultz on

20     behalf of Cincinnati Enquirer.

21            THE COURT:  Okay.  Thank you, Mr. Greiner.

22        Let me -- in this age of pandemic, let me tell you a

23     few things.  Me, I and my staff, have all been vaccinated,

24     so you don't need to worry about us.  I don't know if you

25     all have been or not.  If you have been, if you'd like to

1    remove your mask to talk, you're welcome to do that.  I

2    think I will do that.  We've got all of this Plexiglass,

3    too, to protect us.  It's a little easier to talk when you

4    don't have a mask on.

5        If you -- normally, we haven't been having people come

6    to the podium because I've been having them just sit at

7    counsel table to speak, but if you're more comfortable in

8    coming to the podium, you may do that.  If you want to stay

9    at counsel table to speak, then, you don't need to stand,

10   just make sure the microphone is pulled towards you.  I

11   think those are all of the ground rules.

12       I want to thank you for bringing this interesting case

13   to me.  I have some questions that I want to ask you and I

14   also want you to make argument.  Let me ask you, would you

15   like me to go over the questions first or do you want to

16   make a brief statement first?  It's up to you.

17           MR. GREINER:  Do you have a preference, Bill?

18           MR. KING:  Your Honor, I think if you give us the

19   questions first, it would be very helpful.

20           THE COURT:  Is that all right with you, Mr.

21   Greiner?

22           MR. GREINER:  That's fine, Your Honor.

23           THE COURT:  All right.  My first question, then, is

24   for the Enquirer.  Do you challenge the Department of

25   Justice's statement that its search for Operation Speakeasy

1    records turned up no responsive documents?

2         MR. GREINER:  Your Honor, we don't.  We are not

3    really in a position to question it, quite honestly.

4    They're the ones who searched for it, so --

5         THE COURT:  Okay.  So Operation Speakeasy is not an

6    issue in this matter anymore?

7         MR. GREINER:  I don't know that I'm prepared to go

8    that far in the sense that I think it's a nomenclature, so

9    I'm not sure whether, you know, it was called something else

10   but substantively it was the same.  I just don't have an

11   answer to that question.

12        THE COURT:  Okay.  Mr. King, anything you'd like to

13   say?

14        MR. KING:  No, Your Honor.

15        THE COURT:  All right.  Let me ask you this, then,

16   Mr. King.  I'm not sure from Mr. Greiner's answer if you're

17   still disputing Operation Speakeasy or not.

18        MR. GREINER:  Again, my hesitancy to unequivocally

19   say, I just -- I don't necessarily want to assume that --

20   the substance of the operation I think is in play and I

21   don't want to suggest that it's not.  Whether it was filed

22   or, you know, characterized internally as Operation

23   Speakeasy, we have information that suggests that that was

24   the name of the operation.  The response was that there was

25   a search using that as a search term in the records and it

1    came up nothing.  So I guess I'm just trying to be careful

2    in terms of how much I'm willing to concede to.

3        I don't want to suggest that the substance isn't there,

4    but I don't have any way of contesting that they -- however

5    they used that search term, that the search term itself

6    turned up -- you know, did not turn up documents with the

7    words "Operation Speakeasy" in it.  I just don't have a way

8    to do that.

9            THE COURT:  Okay.  Just to make sure, Mr. King, the

10   defendants have conceded the truth of the complaint

11   allegations for purposes of summary judgment.  The Enquirer

12   alleged in the complaint that DEA agents conducted Operation

13   Speakeasy to investigate the Commonwealth Attorney.  If that

14   is true and you have conceded that it is true, then, why did

15   the DOJ not find responsive documents when it searched for

16   "Operation Speakeasy"?

17           MR. KING:  Your Honor, I can't answer that

18   question.  The search was done for "Operation Speakeasy,"

19   and it did not turn up any documents.

20           THE COURT:  Okay.

21           MR. KING:  So I understand the question.  I just

22   don't have an answer as far as -- I mean, I think we agreed

23   to, in order to move this case forward, we would file a

24   motion for summary judgment and agree that the facts in the

25   complaint were to be deemed as true.

1     THE COURT:  Okay.  All right.  Then, the Court will

2     consider Operation Speakeasy not really part of this case

3     anymore.

4        Let me next ask you, Mr. Greiner, what is the public

5     interest in the Ryan Jacobs investigation records that do

6     not implicate wrongdoing by the Commonwealth Attorney and

7     could not be relevant to the US Attorney's decision not to

8     charge the Commonwealth Attorney?

9        You want me to give that to you again?

10        MR. GREINER:  Yeah.

11        THE COURT:  Okay.  All right.  What's the public

12     interest in the Ryan Jacobs investigation records that do

13     not implicate wrongdoing by the Commonwealth Attorney and

14     could not be relevant to the US Attorney's decision not to

15     charge the Commonwealth Attorney?

16        MR. GREINER:  I think that -- as I consider the

17     record here and given the stipulated facts, I think that the

18     question that comes up for the public, public interest, is:

19     What did the DOJ know and when did they know it?  Kind of go

20     back to, you know, the Watergate era to a certain extent.

21     And so I think that the facts related to Ryan Jacobs and his

22     activities are part of the decision-making process that we

23     think is the matter of public interest, the Department of

24     Justice's decision not to prosecute the Commonwealth

25     Attorney, not to proceed with prosecution of the

1    Commonwealth Attorney.

2        Now, within that, there could be documents -- I would

3    concede that there could be documents that do not relate to

4    that.  Having not seen a Vaughn Index, having not been a

5    part of the search, it's a little hard.  You know, we are

6    just necessarily in the dark to a certain extent.  I think

7    that the activities of Ryan Jacobs certainly that relate to

8    the Commonwealth Attorney, whether that be the drug

9    trafficking, whether that be the drug use, whether that be

10   efforts by the Commonwealth Attorney to impede the

11   investigation of Ryan Jacobs, certainly are a part of the

12   inquiry and that are a matter of great public interest.

13       To the extent there are other records that do not go to

14   that that would be listed on a Vaughn Index, I think we

15   could come back, you know, we could talk about that.  We

16   could consider, A, the relevance; B, whether those records

17   fall under the exemption, the privacy exemption.  But I

18   think that -- so yes, I mean, I think if there are documents

19   that really don't go to the conduct of the Commonwealth

20   Attorney, I think the public interest that we have stated is

21   somewhat diminished with respect to those records.  But I

22   don't -- it's hard to say in the abstract because, you know,

23   do they -- are they tangentially related and help inform the

24   decision-making process?

25       I mean, it is possible that at the end of the day, if

1    the records are produced, that one outcome is the public is

2    very confident in the decision not to prosecute the

3    Commonwealth Attorney and there may be facts that are

4    somewhat tangential on their face but that play into the

5    decision, you know, that were part of the decision that go

6    to that, so it's a little bit hard to answer that question

7    in the abstract.  But, certainly, you know, we would expect

8    that, you know, there may be some documents in the

9    collection that may legitimately be subject to the 7(C)

10   exception and it may be redacted or, you know, potentially

11   could be withheld.

12        But, again, it's a little bit hard to say in the

13   abstract.  But certainly the public interest here, as we've

14   stated and we think the great public interest, is the

15   decision in light of the evidence that has been stipulated

16   by the government not to proceed with an investigation --

17   well, at least with the prosecution of the Commonwealth

18   Attorney.  You know, what -- why?  We think that is a matter

19   of great public interest.  And we believe that the case law

20   we've cited, primarily the *CREW* case, very much supports

21   that notion.

22             THE COURT:  Thank you.  That was a good answer.

23             MR. GREINER:  Thank you.

24             THE COURT:  Mr. King, anything you wish to say in

25   regard to that?

1        MR. KING:  Yes, Your Honor.  Anything that would be

2   tangentially related to the Commonwealth Attorney and the

3   Ryan Jacobs investigative records would also be subject to

4   the Exemption 7(C) under the FOIA, and so those records

5   would need to be withheld as well.

6        And, categorically, I think the question here

7   ultimately is:  Was the decision to withhold the 7(C)

8   records from Ryan Jacobs a valid act by the agency?  And we

9   believe it is because the interests in -- although, there

10  may be a public interest in the Commonwealth Attorney being

11  prosecuted, the interest to Ryan Jacobs is -- is -- well, to

12  get back to the question, the decision to prosecute the

13  Commonwealth Attorney is not a decision -- is not something

14  that the public gets to know.

15       The decisions to prosecute are something that is for

16  the prosecutor.  The prosecutorial discretion is not

17  disclosed across the country for a significant number of

18  reasons, in order to protect individuals like the

19  Commonwealth Attorney from the embarrassment, potential

20  embarrassment, harassment or -- and other individuals

21  involved in the investigation.  And I can say more about

22  that in argument, but, generally, the *Fund* case that is

23  argued that applies there does not apply here.  There is

24  significant -- that was a significantly unique case.

25            THE COURT:  Which case are you talking about, the

1     *CREW* case?

2          MR. KING:  The *CREW* case.

3          THE COURT:  *CREW* case, okay.

4          MR. KING:  Yeah.  That is significantly a unique

5     case involving Senator Ensign, and the factors involved

6     there are not, not at all present in this case.

7          THE COURT:  Okay, okay.  Let me ask you, then, Mr.

8     King, the Enquirer has agreed that identifying information

9     about the Commonwealth Attorney and any other third parties

10    can be redacted.  Why isn't that sufficient protection of

11    their privacy interests?

12         MR. KING:  Because the identifying information

13    isn't going to be sufficient to limit whether or not -- they

14    will still be able to identify who, whose names are

15    redacted, and based on the circumstances of the case, the

16    names -- for example, if the Commonwealth Attorney's name is

17    redacted and the records regarding Ryan Jacobs are released,

18    they're going to know who the Commonwealth Attorney is, if

19    he's involved in some kind of drug transaction or something

20    like that.  So that will disclose the fact that the

21    Commonwealth Attorney is -- has been investigated for drug

22    transactions.

23         So in order to protect whether or not the Commonwealth

24    Attorney was investigated, you'll have to -- you have to --

25    you can't disclose the records of the investigation and only

1    redact his name, if it's even in there, because it will

2    disclose who he is.  They will know, everyone will know, who

3    it is if the name is redacted.

4         THE COURT:  Okay.  Anything you want to say on

5    that, Mr. Greiner?

6         MR. GREINER:  Yes, Your Honor.  We believe that we

7    are in a very narrow lane here.  We're not asking this Court

8    to dramatically expand any of the -- or constrict I guess

9    the FOIA exemption, the 7(C) exemption.  We acknowledge that

10   the majority of times in a situation with a decision not to

11   prosecute with third parties who have not been charged that

12   that probably in the majority of times is going to fall

13   under the 7(C) exemption.  So we acknowledge that.

14        THE COURT:  Okay.

15        MR. GREINER:  But we believe there is a narrow lane

16   that we find ourselves in here supported by the Citizens for

17   Responsibility & Ethics in Washington.  Mr. King referred to

18   as the "*Fund* case," but I think I called it the *CREW* case,

19   but it is the case about Senator Ensign.  And in that case,

20   the Court correctly determined that the public interest and

21   the decision by the FBI and the Department of Justice not to

22   proceed with charges against Senator Ensign was a matter of

23   public interest, of great public interest, notwithstanding

24   the fact that ordinarily uncharged suspects are entitled to

25   a level of privacy.

1    I think it is important to point out that the Court

2    found that Senator Ensign had a privacy interest.  I think

3    there was an effort by the defendant in the plea, in the

4    papers, to suggest that he, that Senator Ensign, had

5    forfeited his privacy interest; he didn't.  The Court didn't

6    find that.  The Court found explicitly that he retained a

7    privacy interest.  What it found, however, was that in that

8    lane -- we think we're in the same lane -- of a

9    highly-placed public official who is credibly accused of

10   serious wrongdoing and which results in charges being filed,

11   that that creates a matter of great public interest.  That

12   said it outweighs the privacy interests of that public

13   official.  So there have to be pretty specific criteria for

14   this lane that we find ourselves in, and we think we're

15   there.

16   Admittedly, the Commonwealth Attorney is not a United

17   States Senator, but he is the highest-ranking law

18   enforcement official in the third-largest county in

19   Kentucky, so he is highly placed.  The allegations are

20   serious, drug trafficking, drug use, obstruction of justice.

21   So if you just substitute the names "Commonwealth Attorney"

22   for "Senator Ensign," it's really hard to distinguish, it's

23   really impossible I think to distinguish the *CREW* case.  And

24   the Court in *CREW* said it will ordinarily be enough for the

25   Court to consider the rank of the public official involved

1    and the seriousness of the misconduct alleged.  So we're

2    really talking about, like I say -- you know, I've said it a

3    number of times, but this narrow constriction of the 7(C)

4    exemption that most of the time is not going to apply, but

5    we think it applies here, and we think it should apply here.

6        I think the public has an interest in understanding why

7    charges would not be brought given the undisputed facts

8    presented to the Court.  I think -- you know, I think in

9    where we sit when we're sitting here, when you think about

10   the Department of Justice's interests, for example, in the

11   corruption charges with the Cincinnati, Ohio that led to

12   indictments of three sitting city council members, we see

13   the public interest, we see the interest of the government

14   in looking into local -- or the federal government in

15   looking into, under the right set of circumstances, local

16   activity in the political realm, and that's what we have

17   here.

18       We are not using FOIA to get to Kentucky records; that

19   would be improper.  We're simply looking for federal records

20   of the Department of Justice, the DEA, that had to do with

21   credible charges of serious wrongdoing by a highly-placed

22   public official.  And we believe that that is where we find

23   ourselves and that the Court should under the, you know,

24   philosophy of FOIA, which is full agency disclosure, that

25   this is a case where the 7(C) exemption in a very narrow

1    circumstance would not apply because the public interest in

2    the decision by the DOJ not to proceed, given the undisputed

3    facts presented, warrant the constriction of that exemption.

4         And by the way, we are not -- I don't think that

5    allowing public scrutiny of the prosecutor's decision

6    impedes the prosecutorial discretion.  I mean, we're not,

7    we're not saying -- you know, I think the fact that the

8    prosecutor's decision in a very limited circumstance may be

9    subject to public scrutiny does not impede the prosecutor's

10   discretion.  As I said, we may find out that based on the

11   information provided that that was the absolute right

12   decision.  It's very possible that the Ryan Jacobs interview

13   discloses a very, you know, less-than-credible witness.

14   And, you know, as I say, I think the public could come away

15   from this satisfied that the right decision was made.  The

16   public could come away from this wondering, well, why was

17   that, that doesn't seem like the right decision, there was a

18   lot of evidence here.

19        And, again, that's -- at the end of the day, that's

20   where we are.  I mean, I keep hearing from the Department of

21   Justice that, well, this is just this, this is how it is,

22   kind of take our word for it, trust us, you know, this

23   decision is our business and not the public's business; and

24   we just fundamentally disagree on that in this limited

25   circumstance.

1          THE COURT:  Mr. King, anything else you want to

2     say?

3          MR. KING:  Your Honor, yes.  I just want to explain

4     why the *CREW* case here is not applicable.  And, yes, it was

5     a US Senator, but not only that, the US Senator there

6     publicly admitted the act that was investigated, and he

7     publicly said that the Department of Justice was not

8     pursuing any charges against him.  He also resigned to

9     the -- resigned as a senator because of that controversy.

10         There was a special council appointed, and the special

11     council released findings on the circumstances of that case

12     and demonstrated the substantial credible evidence of the

13     wrongdoing by the senator.  The special council referred the

14     matter to the Department of Justice, and the matter was

15     widely reported in the media and discussed, and other

16     senators issued public statements about the referral to the

17     Department of Justice.  And none of that is present here in

18     this circumstance.

19         The Commonwealth Attorney did not admit to anything.

20     He never admitted that the DOJ was not going to pursue any

21     charges or resign from his position.  That case is just not

22     applicable here, and to find that it is and to open a

23     decision by the US Attorney's Office to public scrutiny like

24     that would open the floodgates to any individuals -- public

25     officials that are investigated by any government agency,

1     the Department of Justice, FBI, DEA, ATF.  And if this Court

2     were to find that the *CREW* case is applicable here and

3     disclose these records, I would not be surprised the next

4     day that many FOIA requests would go out to many, many

5     public officials across this state and Kentucky in search of

6     records.

7          But what happened here, the plaintiffs here, the

8     Enquirer, did not submit a FOIA request to the US Attorney's

9     Office as to why they made their decision.  It was submitted

10    to the DEA for records related to Ryan Jacobs.  It wasn't

11    submitted to DEA for records related to the Commonwealth

12    Attorney, and if it was submitted to the US Attorney's

13    Office, it would have been denied.

14         The *Fund* case I mentioned is a case that says that

15    prosecutorial discretion is rarely subject to judicial

16    review and public scrutiny.  It typically is entrusted

17    solely to the prosecutor.  And I know Your Honor was in the

18    US Attorney's Office.  And so I think the question here is

19    not whether or not the *CREW* case applies.  It's whether or

20    not the agency's search or nonsearch categorical exclusion

21    of the 7(C) records was appropriate here, and I believe it

22    is.

23              THE COURT:  So what you're basically saying is that

24    *Reporters Committee* in which there was a categorical denial

25    of records pursuant to Exemption 7(C) is the applicable case

1    to this, to this matter?

2         MR. KING:  You're absolutely right, Your Honor.

3    The Supreme Court *Reporters Committee* case, the categorical

4    denial for the FBI rap sheet.

5         THE COURT:  And you don't see that narrow lane that

6    Mr. Greiner is talking about in this case because there was

7    notoriety, it did involve a public official, not a federal

8    public official, but the question in a FOIA investigation is

9    transparency of what the federal government did, and that's

10   really the issue here?

11        MR. KING:  Yes.  And in the senator's case, he

12   admitted to everything.  You know, it wasn't like the

13   information was going to be disclosed and ruin his life.

14   He -- the information had already been disclosed.  He had

15   already admitted to it.  He had already resigned from being

16   a senator.  You know, the Commonwealth Attorney, that's

17   not -- it's not the case here.  It's not applicable.  It's

18   distinguishable.

19        THE COURT:  Thank you.

20     Anything else you want to say, Mr. Greiner, in regard

21   to that?

22        MR. GREINER:  Well, again, I think the fact that

23   the senator had publicly admitted to the controversy goes to

24   the privacy interest; and, again, the Court said he retained

25   his privacy interest, notwithstanding that admission.  So it

1    really has nothing to do with the facts in this case that

2    the Commonwealth Attorney hasn't made a public admission of

3    wrongdoing.  The United States Government has made a public

4    admission of wrongdoing because they admitted to these

5    facts.  They were not required to agree to the stipulation;

6    they did, but that was their choice.

7         So whether the Commonwealth Attorney admitted to the

8    facts set out in the complaint is irrelevant because that

9    would go only to the privacy interest at best, but the fact

10   of the matter is that the government has admitted to these

11   credible facts by their own doing.  So the idea that the

12   Commonwealth Attorney hasn't made an admission really isn't

13   before us.

14        Mr. King said that the prosecutorial discretion is

15   rarely subjected to public scrutiny; I agree.  We said that,

16   you know, this is that rare case.  He can't say with a

17   straight face that it is never subjected to public scrutiny,

18   so we have some common ground there.  We agree that it is

19   rare.  We agree it is one of these rare cases.

20        The *Reporters Committee* case was a situation where

21   there was a request made for rap sheets and criminal

22   histories.  There was no indication that there was a

23   contention about a failure to charge or the kind of

24   circumstance here.  So it was really more about -- this is

25   not fair, I guess, but idle curiosity to a certain extent

1    about some notorious figures.  That's not our case here.

2        We have a situation where there was a decision made not

3    to proceed with charges despite admitted credible facts that

4    suggest that charges would have been appropriate, and that

5    information was gathered and collected and investigated by

6    the DEA.  I think the DOJ relied on that information in

7    making its decision.  So the request to the DEA is perfectly

8    consistent with the theory of the case.

9        So we believe that we would disagree that *CREW* is not

10   binding, is not controlling here.  Obviously, it's from a

11   different circuit, but we think the thought process and the

12   theory that the Court applied, you know, serves us well.  As

13   the Court said in *CREW*, if disclosure of the requested

14   records in these circumstances would not serve the public

15   interest of promoting the citizens' right to be informed

16   about what their government is up to, it is hard to imagine

17   DOJ ever accepting any public interest other than

18   misconduct.

19       So we again come back to that point, and I don't think

20   it opens the floodgates, Your Honor.  As I said, we're

21   talking about a balancing test, so what you do in this case

22   on these facts does not control the next case because every

23   case is a balance.  And, again, there are guardrails on the

24   floodgates here in that we're talking about -- we're not

25   talking about private individuals.  We're not talking even,

1   I don't think, about low-level government officials.  We are

2   talking in this case about an elected official, the

3   highest-ranking law enforcement officer in the county, and,

4   you know, we believe with a decision -- coupled with a

5   decision not to prosecute.

6       If a decision were made to go forward and prosecute,

7   there would be the availability for public scrutiny because

8   the -- you know, there's open courts, the dockets are open,

9   the pleadings, the filings are available, so the public

10  citizenry would have access to information to inform it.

11  It's when the decision is made not to move forward is when

12  things are, you know, under wraps, and again most of the

13  time, those wraps would stay in place.  We think that,

14  again, we are in a lane that suggests otherwise in this

15  case.

16          THE COURT:  Thank you.  All right.  I think, I

17  think you both answered my questions real thoroughly.  Now

18  if you would like to make argument, I'd be more than happy

19  to hear it.

20          MR. GREINER:  Up to you.

21          MR. KING:  Sure, we can make argument.

22          THE COURT:  Okay.  All right.  I guess these are --

23  it's summary judgment, so normally I guess the defendant

24  would go first, but it's really cross-motions for summary

25  judgment.  So I'll leave it up to you who would like to go

1    first.

2              MR. GREINER:  I think you filed first, so I'll

3    defer.

4              MR. KING:  All right.  That's fine.  Yes, Your

5    Honor, I don't want to take up a whole lot of time because

6    we've already addressed I think the important issues in the

7    case.  There's really two questions here.  You know, are the

8    7(C) privacy interests outweighed by the public's interest

9    in understanding why the Department of Justice --

10             THE COURT:  Mr. King, can I stop you for one

11   minute?

12             MR. KING:  Yes, Your Honor.

13             THE COURT:  Somebody took the only pad that I had

14   up here, it's missing, and I want to be able to take notes.

15        Okay.  I found one.  All right.  Would you mind

16   starting again?

17             MR. KING:  No problem.  There's really two

18   questions here.  Are the 7(C) privacy interests outweighed

19   by the public's interest in understanding why the Department

20   of Justice declined to prosecute the Commonwealth Attorney?

21   And a second question would be:  Is the DEA's decision to

22   categorically deny the request without conducting a search

23   valid?

24        And with respect to the 7(C) privacy interests

25   outweighing the public's interest and whether or not to --

1    and why the Department of Justice declined to prosecute the

2    Commonwealth Attorney, as I stated earlier, the *Reporters*

3    *Committee* case is found -- the Supreme Court of the United

4    States found that, in discussing strong privacy interests

5    protected under Exemption C found that the third party's

6    request, as here, for law enforcement records pertaining to

7    a private citizen invades that citizen's privacy and

8    categorically upheld the denial, upheld the denial,

9    categorical denial under 7(C) for the FBI criminal

10   histories, is what they were.

11        THE COURT:  That was sort of a fishing expedition

12   for rap sheets.  That was an unusual case, too, I'd say.  I

13   would agree that that was a 7(C) case, but is that this

14   case?

15        MR. KING:  Well, the Enquirer didn't request

16   information from the US Attorney's Office here, who made the

17   decision not to prosecute or the Department of Justice

18   Attorney General's Office in DC.

19        THE COURT:  But does it make a difference whether

20   they requested it from the DOJ or they requested it from the

21   DEA who had all of the evidence there was on which the US

22   Attorney based his decision?

23        MR. KING:  Well, they didn't request the records

24   for identifying the Commonwealth Attorney.  They requested

25   the records for Ryan Jacobs, who had already been

1   prosecuted, who maybe they thought they would have better

2   success at getting those records because he had been

3   prosecuted and had been in the public, had a public trial, I

4   believe.  And so maybe they thought that was a better way to

5   get records than to ask straight-up for records from the

6   Commonwealth Attorney, who obviously would have a

7   significant privacy interest and whether or not he was

8   actually investigated.  Ryan Jacobs we know was

9   investigated.

10          THE COURT:  But the Commonwealth Attorney wouldn't

11  have records.  It would still be the DEA records from the

12  investigation of Ryan Jacobs.  I think that's the only --

13          MR. KING:  That's correct.

14          THE COURT:  Okay.

15          MR. KING:  But the decision, they -- why the US

16  Attorney's Office did not prosecute Mr. -- or the

17  Commonwealth Attorney, not from the DEA.  They know what the

18  DEA's opinion on it was apparently because they referred --

19  made a referral to the Department of Justice.

20          Anyway, in order for them to be successful here, they

21  have to show that the information would shed light on the

22  agency's performance of their statutory duties.  And they

23  made no allegation that the agency failed here, and, quite

24  the contrary, they say the agency, the DEA, performed their

25  duties in their investigation of Mr. -- of the Commonwealth

1    Attorney and Ryan Jacobs.

2          THE COURT:  I don't think they're looking at DEA.

3    I think they're looking at the decision of the US Attorney

4    and on what he based his decision not to prosecute.

5          MR. KING:  Right, right.  But they need to allege

6    that there was a wrongdoing or a bad -- basically, a bad

7    actor in carrying out the agency's performance of their

8    statutory duties.

9          THE COURT:  Well, the agency we're talking about,

10   though, is not DEA, it's the US Attorney, that's who they're

11   ultimately asking about.

12         MR. KING:  That's correct.

13         THE COURT:  Okay.

14         MR. KING:  But they didn't file a FOIA request with

15   the US Attorney.  They filed a FOIA request with the DEA.

16         THE COURT:  Well, I would assume that the reason

17   they filed it with the DEA is that the DEA was the

18   government agency that collected all of the evidence.

19         MR. KING:  Yes, Your Honor, but any, any memo that

20   would have a decision on why they didn't prosecute the

21   Commonwealth Attorney or not would be with the US Attorney's

22   Office, not the DEA.  If there was -- if there was any

23   evidence to show why the Commonwealth Attorney was not

24   prosecuted, it wouldn't be with the DEA.  It would be in the

25   US Attorney's Office or it would be with the Attorney

1    General in DC.

2         THE COURT:  Okay.

3         MR. KING:  So as I said before, the decision to

4    prosecute an individual for a crime is typically entrusted

5    to the prosecutor, and that is because to disclose

6    information that someone was investigated and not charged is

7    a significant intrusion into their lives and puts them in

8    the public forum to be judged in that regard without any

9    procedural protections with respect to the criminal law.

10        The other question is whether or not the DEA's decision

11   to deny the request without conducting a search is valid.

12   And, basically, what would happen here is if -- the reason

13   why it's valid is because, if all of the information

14   regarding the Commonwealth Attorney was produced but his

15   name was redacted, then, there wouldn't be -- it wouldn't

16   help out.  There would be nothing useful for the Enquirer to

17   see.  If everything was redacted or everything was withheld

18   with his name, it wouldn't have anything to do -- there

19   wouldn't be anything to show that he was investigated.

20   There wouldn't be anything to show that he was part of any

21   crime or any drug use or anything like that.

22        There would be no value to the plaintiff, and that's

23   why it's basically futile to disclose information with

24   redactions and because you have to withhold the documents

25   that are -- also provide context, not just the

1   identification of an individual.  Because you have -- the

2   agency would have to withhold information that provides

3   context, there wouldn't be anything else that would be

4   helpful to the Enquirer in this case because all of that

5   information about the Jacobs investigation that had anything

6   to do with the Commonwealth Attorney, if it exists, would

7   have to be withheld.  And that's why it would be valid,

8   because it wouldn't be useful at all to the requestor and no

9   value to them if it's disclosed.

10      In essence, to require the disclosure of the

11  Commonwealth Attorney's -- whether or not the Commonwealth

12  Attorney was investigated, to require the disclosure of the

13  decision of the US Attorney not to prosecute him would be

14  unwarranted here.  It would be unprecedented with outside of

15  the *CREW* case, which is a very rare exception.  It's the

16  only case we've talked about here, for a reason, with

17  respect to whether or not that would even apply.  And

18  subjects to criminal -- subjects to criminal investigations

19  have a significant strong privacy interest, especially when

20  they don't have the benefit of a trial, and there would be

21  no benefit here.

22      If all of the records were sealed, if all of the

23  records were redacted and withheld the information required

24  to prevent the identity, to prevent the identity of the

25  Commonwealth Attorney to be known, then, it wouldn't have

1    been helpful here for the Enquirer to receive those

2    documents in the first place, and that's why the Exemption C

3    categorical denial was appropriate here.  Thank you.

4         THE COURT:  Thank you, Mr. King.

5       Mr. Greiner?

6         MR. GREINER:  Thank you, Your Honor.  Your Honor,

7    we believe that the test that was set out in the *NARA versus*

8    *Favish* case -- and that was the case that involved the

9    Vincent Foster photographs, but that the test that the Court

10   set out was that the requestor must produce evidence that

11   would warrant a belief by a reasonable person that the

12   alleged government impropriety might have occurred.  We have

13   produced evidence in the form of the stipulated facts.

14   Again, the government stipulated to the facts set forth in

15   the complaint.  So we have come forward with evidence.

16        In other cases that the government cited, there were

17   instances where there was no stipulation and the requesting

18   party really did not have an adequate factual record.

19   That's not our case.  We do.

20        And I think it's important to think about the language

21   of the *Favish* test.  The alleged government impropriety

22   might have occurred, that is the standard, not that it did,

23   not that we can prove unequivocally or even by a

24   preponderance of the evidence that impropriety occurred.

25   The test is that it might have occurred.

1      And so we have set forth in the stipulated facts a

2   scenario where the Commonwealth Attorney is implicated in

3   drug trafficking, in drug use, in obstruction of justice,

4   and a decision is made not to proceed with prosecution.

5   That satisfies the test that government impropriety might

6   have occurred there.  We don't know that.  We can't say that

7   for certain, but we don't have to under the *Favish* test, and

8   that is what we come to you with in this case.

9      Again, the defendant, you know, contends that or comes

10  back to the notion that you don't typically scrutinize a

11  prosecutorial discretion, and, again, we don't disagree with

12  that.  You know, again, I've reiterated it enough that I'll

13  stop talking here in just a minute, I promise.  But we

14  believe that in this limited circumstance, in this

15  particular case where you do the balancing, in this

16  instance, that at a minimum a Vaughn Index should be

17  produced so that there can at least be some, some ability

18  for our clients to see the picture out there.  I mean, to

19  not even get to that point I think is completely unwarranted

20  in this case.

21      And, indeed, a lot of the cases -- the *Rimmer* case,

22  which is one of the leading Sixth Circuit cases, there was

23  production; there was not a categorical denial.  Many of the

24  cases that are cited by -- in defendant's briefs are

25  situations where the dispute was over redactions.  The

1    dispute wasn't over categorical denials.  There was a Vaughn

2    Index, there were documents produced, and where the Court

3    got involved was over the propriety of the redactions, but

4    that's not our case.

5        We haven't seen anything.  We haven't seen a Vaughn

6    Index.  We have not seen redacted documents.  At a minimum,

7    I think the unique facts in this case support the notion

8    that we ought to at least get to that stage and then maybe

9    we'll be back in front of you again.  But the idea that we

10   are simply categorically shut out, given the undisputed

11   facts that are presented to you, just makes no sense from

12   where we sit.  Thank you, Your Honor.

13            THE COURT:  Thank you, Mr. Greiner.

14       Mr. King, Mr. Greiner raised the one issue we haven't

15   talked about, which is a remedy that the Court could order,

16   and that is a Vaughn Index.  How do you feel about that?

17            MR. KING:  Your Honor, for the reasons that we

18   previously discussed as to why the exemption was proper, I

19   don't think we need a Vaughn Index here, because a

20   categorical denial was appropriate.  However, if, if Your

21   Honor sees fit to order us to produce information, we would

22   submit that the Vaughn Index be in camera to withhold

23   whether or not this individual was actually investigated,

24   whether or not -- to prevent any, any information from

25   coming out that is sought to -- that would be disclosed

1    regarding the Commonwealth Attorney and would be

2    inappropriate to release.

3            THE COURT:  Okay.  I have to admit that over the

4    course of 25 years, I can't remember ever having another

5    FOIA case.  I don't know why I've escaped it, but this is

6    the first.  And if the Court does find that a Vaughn Index

7    is appropriate, do you agree, Mr. Greiner, that that should

8    at least initially be in camera?

9            MR. GREINER:  I believe that's correct, Your Honor.

10           THE COURT:  Okay.  All right.  Anything else from

11   counsel?

12           MR. KING:  No, Your Honor.

13           MR. GREINER:  Not from me, Your Honor.

14           THE COURT:  I think both have done an excellent

15   job.  I appreciate how much work you've done in this case

16   because you've made the Court's decision much easier.  I'll

17   take the matter under submission and will issue an order as

18   soon as possible.

19           MR. GREINER:  Thank you, Your Honor.

20           MR. KING:  Thank you, Your Honor.

21           THE COURT:  Thank you.

22           THE DEPUTY:  All rise.  Court is now in recess

23   until 3:00.

24       (Proceedings concluded at 11:51 a.m.)

25

1              **C E R T I F I C A T E**

2          In accordance with 28 U.S.C. Section 753, I certify
   that the foregoing is a correct transcript of the record of
3  proceedings in the above-entitled matter prepared from my
   stenotype notes and that the transcript page format is in
4  accordance with the regulations of the Judicial Conference
   of the United States.

5          */s/*  *Lisa Conley Yungblut*                    *11/17/2021*

6          LISA CONLEY YUNGBLUT, RDR, RMR, CRR, CRC      DATE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25